**DYNAMIC SOLUTIONS, INC., Plaintiff,**

v.

**PLANNING & CONTROL, INC. & John Z. Censor d/b/a Censor & Company, Defendants.**

No. 86 Civ. 1886–CSH.

United States District Court, S.D. New York.

Oct. 3, 1986.

Fryer, Ross & Gowen, New York City, for plaintiff; Gerald E. Ross, of counsel.

Fischer & Burstein, P.C., Meyers, Tersigni, Kaufman, Lurie, Feldman & Gray, New York City, for defendants; Stanley H. Fischer, Richard N. Gray, Robert H. Riley, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff brings this action for copyright infringement, 17 U.S.C. § 501 *et seq.*, and conversion and unfair competition under state law. The dispute concerns certain computer software, or "programs," of which plaintiff claims ownership. Subject matter jurisdiction is predicated on 28 U.S.C. § 1338(a), (b) and principles of pendent jurisdiction. Venue is proper under 28 U.S.C. § 1400(a).

Plaintiff moves pursuant to Rule 65, F.R. Civ.P., for a preliminary injunction barring defendants from using those programs or any computer programs based thereupon. By Memorandum Opinion and Order dated March 13, 1986, familiarity with which is assumed, a temporary restraining order was granted, which was extended on con-

sent, *see* F.R.Civ.P. 65(b), until certain discovery could be completed and the preliminary injunction motion decided.

A hearing was held April 29, 1986 and May 2, 13 and 14, 1986, and testimony was taken from plaintiff's principal and its expert witness. Plaintiff also introduced, in the form of deposition transcripts,[1] testimony from defendant Censor, who appears to be the principal of defendant Planning and Control, Inc. ("PCI"). Defendants indicated that their only prospective witness was a computer expert of their own. (Tr. 384). For scheduling reasons, and because defendants strongly argued that plaintiff was not entitled to the requested injunction on the existing record, no testimony from defendants' expert was taken. Instead, defendants were asked to make an offer of proof as to its expert's testimony, and the parties then briefed the question whether plaintiff was entitled to the sought-after relief based on the testimony to date and the defendants' proffer. That is the question now before me.

I. *Factual Background*

This case involves the breakdown of a once-symbiotic relationship between two companies and two principals. Defendant John Censor's occupation is providing business training programs. At one time, Censor did business as "Censor and Company." (Tr. 71–72). He now does business through PCI, and the parties have treated the two defendants as one. At least some of PCI's training programs use computer simulation games; the computer software at issue here runs two of those games. Censor, however, appears to have only limited knowledge of computers and computer programming, and relies upon others to supply the necessary hardware and software.

Plaintiff Dynamic Solutions, Inc. ("DSI") is in the computer business and has supplied PCI with software for computer simulation games for a number of years. DSI was formed in 1971 by its present principal, Joseph Melhado, and one Anthony Paris. Initially Melhado and Paris were equal partners in the company. In or about 1973 formal ownership of Paris' share was transferred to Melhado, but Paris continued to receive 50 percent of DSI's profits as compensation as an employee and vice-president of DSI until some time in 1985. (Tr. 9, 70–71). Both Paris and Melhado did computer programming for DSI.

The relationship between DSI and PCI began about 1972. Censor contacted Paris with an eye toward joining forces to provide a training course for one of Censor's clients with a computer simulation component. Censor was to provide the training course and DSI was to provide the computer software. No software, however, was written until 1973, when Censor and Paris "got involved with Chase Manhattan Bank." Censor created a training course for Chase, and DSI created the simulation software. Paris was apparently responsible for writing the "source code"[2] created especially for the simulation games; this source code referenced and incorporated certain "utility codes," or "utility routines," that Melhado had written in the past for other DSI clients and which apparently cause the computer to execute certain specific functions which are useful in various programming contexts.[3] The pro-

1. Testimony from the hearing will be cited as "Tr. ——." Testimony from Censor's deposition will be cited as "Dep. ——."

2. The witnesses distinguished several levels of instructions to the computer which cause the computer to execute the desired result. The programmer actually writes a series of instructions known as the "source code." Source codes may be written in a number of different computer languages; the languages involved in this case are known as "FORTRAN" and "Pascal." The computer translates the source code through what appears to be a two-step process

into "object code." "Object code" is the basic set of instructions that the computer actually executes, and consists of a series of numbers. The object code "is very difficult to comprehend by human beings." See Tr. 22–24, 234–35. *SAS Institute v. S & H Computer Systems,* 605 F.Supp. 816, 818 (M.D.Tenn.1985).

3. Apparently utility codes such as those created by Melhado are often developed and stored in a "subroutine library," which can then be called upon in various programming contexts to perform necessary common functions. (Tr. 232–34).

grams were written in FORTRAN and, designed to run on timesharing, mainframe computers, were stored on timesharing computer systems in accounts maintained by DSI and which could be accessed only by those who had knowledge of DSI's "password." When the simulation games were run in the course of a training seminar, each terminal would be hooked up to the mainframe computer through a telephone line. (Tr. 12–14; 74).

On December 8, 1975, DSI by Melhado and Censor & Company by Censor executed a letter agreement (hereinafter sometimes referred to as the "1975 agreement" or "the agreement") intended "to clarify, define and regularize the relationship, the responsibilities, obligations and rights of both parties." [4] (¶ 2). The agreement, drafted by Censor, first describes various aspects of the parties' then-existing relationship. DSI, it states, "currently serves Censor and will continue to serve as a time-sharing broker, i.e. arranging for time-sharing services," for which DSI was paid directly by Censor clients. (¶ 3). The agreement noted, "DSI provides, for some Censor clients, consulting services to create the new software that produces the simulations." (¶ 4). DSI also "provides and makes available, from time to time, certain software which is proprietary to DSI...." (¶ 5). Two examples of programs considered DSI "proprietary software" are given (¶¶ 4, 11), but the term is not further defined in the agreement. DSI had "[i]n the past ... been paid in full for the consulting services and for the use of the proprietary software," and the agreement provides that "this practice will continue by which DSI will be paid for consulting services they render or for the use of any proprietary software, separate from timesharing payments." (¶ 6).

The contract then establishes the ownership of the computer programs and sim-

ulation games. The agreement provides, "[t]he new software, i.e., the computer simulations that result from the efforts of Censor plus the consulting services provided by DSI, for which DSI was and is fully paid, become products which are now the sole and exclusive property of Censor. DSI hereby expressly disclaims any and all claims of ownership, proprietorship or partnership or other interest of any nature whatsoever in these computer simulation products." (¶ 7). DSI further "disclaimed any interest in current simulation products, already created, and/or to new products now under development or those that may be developed at any time in the future." (¶ 8). Although the agreement as drafted by Censor would also have transferred ownership of the DSI proprietary software involved in the simulation programs, that provision was struck by Melhado. (Ex. 1 ¶ 7). The source codes at issue in this lawsuit operate two of the games which, plaintiff concedes, belong to Censor under paragraph 8 of the agreement: "Operations Management" and "Project Management" (together, the "simulation games").[5] Plaintiff also concedes that the source codes that were written to operate these two games on timesharing computers belong to Censor under the 1975 agreement. (These source codes are hereinafter referred to as the "1975 programs" or the "1975 source codes").

The agreement went on to provide:

> Before each and every client engagement in the future, whether for an outright sale, a licensing agreement for an existing product, for the design of a new, custom simulation or for the provision of any Censor service which involves DSI in any way, a brief work order will be prepared by Censor specifying (a) consulting services and (b) proprietary software required and (c) fees to be paid to DSI for

---

**4.** Paragraphs of the 1975 Agreement will be cited as "¶ ——."

**5.** It is crucial to distinguish the simulation games themselves, which plaintiff concedes Censor owns, from the source codes which run those games, certain versions of which plaintiff

claims ownership. That distinction is possible because different computer programs can be written that produce the same output. *See Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 525 (9th Cir.1984).

the use of consulting services and proprietary software.

(¶ 10). These work orders were to be signed by specified officers or partners. (¶ 12).

In the years following the 1975 agreement, Censor continued conducting training seminars using the 1975 programs on the timesharing computers, and DSI continued acting as Censor's "timesharing broker." Paris remained DSI's contact with Censor until he left DSI in the summer of 1985. By that time, Censor and his new corporation, PCI, represented about 90 percent of DSI's business. (Tr. 56–58). Despite the transfer of ownership in the 1975 agreement, Censor never actually possessed the source codes or computer tapes for the simulation games. Rather, DSI maintained them in its time-sharing computer accounts. (Tr. 32). It appears that some of the formalities of the 1975 agreement were not respected. For example, although the agreement provided for preparation by Censor of signed work orders "[b]efore each and every client engagement," no written work orders were ever prepared. (Tr. 44; Dep. 76–77).[6] DSI continued to make "minor" modifications to the simulation programs, at least sometimes on Paris' own initiative. (Tr. 79–81).

The record only provides one specific example of the way Censor and DSI worked together in providing a course involving the timesharing programs to a client. In 1981, Censor contracted to provide Mobil Research & Development Corporation with one of the training simulation programs. Censor negotiated a licensing arrangement with Mobil for one of his simulation training courses. According to Censor, this agreement was similar to those PCI had with other large corporate clients. (Dep. 162). DSI was not a party to the agreement, but it included a provision for DSI's benefit under which Mobil would pay "royalties for the use of certain proprietary computer programs, Scheduling and PERT 6, which underlie the Simulation-Training Program." (Ex. 18 ¶ 16; 175–78).[7] DSI's involvement in and compensation for the Mobil project was worked out in negotiations between Censor and DSI before PCI's contract with Mobil was signed. (Dep. 166–67). No written work order or memorandum was prepared to memorialize PCI's arrangement with DSI. (Dep. 167; Tr. 17). DSI was paid $41,620.18 for its role in the Mobil project; of that amount Censor "believe[d]" $28,500 was for the use of the proprietary programs and the balance was for "timesharing charges and other fees." (Dep. 169).

In the early 1980s, smaller, more portable computers came into use. DSI created software for this new technology to run the simulation games. Programs were developed to run the game on IBM personal computers. According to Censor, Melhado was asked—a "verbal work order"—to procure the IBM hardware and to develop software to run the simulation games on the IBM machine. (Dep. 357).

The microcomputers that DSI and Censor used most often, however, were "Alpha Microcomputers." [8] (Dep. 357). DSI first created a simulation program for an Alpha Microcomputer in connection with DSI's sale of Alpha Micro hardware to the Commercial Bank of Kuwait. The sale of hardware was arranged by Paris, and Melhado reprogrammed the Operations Management simulation to run on the Alpha Micro machine. (Tr. 82–85).

Writing the source code for this 1981 transaction (hereinafter the "1981 source code" or the "1981 program"), Melhado had access to the 1975 Operations Management

---

6. Censor's claim that the "work orders," provided for in paragraph 10, were to be oral simply cannot be reconciled with paragraph 12, which specifically requires certain individuals' signatures on the work orders.

7. Censor testified that Exhibit 18, which appears to be a complete and executed contract between

PCI and Mobil, may have been superceded, but did not believe that paragraph 16 had been changed, at least materially. (Dep. 186).

8. "Alpha Microcomputers" appear to be similar to the more familiar IBM personal computers.

source code, some printouts from "user interactions," and the printed rules for the game. He also consulted with Paris, who had written the 1975 source code for the Operations Management simulation. Melhado concedes that without Paris' assistance, it would have taken too long for him to create the 1981 source code to make the effort practical from a business standpoint. Even with Paris' assistance, it appears to have taken several months. Melhado states, however, that he did not use the 1975 source code written by Paris in writing the 1981 program, because he found the code written by Paris incomprehensible. According to Melhado, the 1981 source code plays the same Operations Management game, with the same output, as the 1975 Operations Management source code. (Tr. 81–94).

There is no indication in the record when Censor became aware of the 1981 project for the Commercial Bank of Kuwait. However, DSI neither asked Censor's permission before creating the new Operations Management source code nor paid him anything for its use of the game or output resulting from user interaction with the 1975 source code. (Tr. 81–94).

In 1983 and 1984, DSI created programs for smaller Alpha Microcomputers. These programs (hereinafter the "Alpha Micro" software or programs) are the focus of the present dispute. An Operations Management program was created in 1983 (the "1983 Operations Management program"), and a Project Management program for the smaller Alpha Micro hardware followed in 1984 (the "1984 Project Management program"). It is not clear when and how

Censor himself was involved in this project. It does not appear to have been undertaken for any particular client; rather, a decision was made to phase out Censor's use of timesharing computers in favor of the more convenient and economical Alpha Micro hardware. (Tr. 12–13; Dep. 355–56). No writing memorializes the arrangement by which DSI was to create, and Censor use, the new software, nor does it appear that DSI undertook the project pursuant to any specific "work order," oral or otherwise. Just how the decision to create such programs was made is not clear.[9] What is clear is that Censor himself did not actually write any source code for the Alpha Micro programs. They were created by DSI. And, it is clear that Censor gladly used the Alpha Micro source codes, once they were written, in his training courses.

The Alpha Micro programs were created by Melhado and Paris together in a manner similar to the way the 1981 source code was created. The programmers had access to the 1975 source codes, printout from user interaction with the game, and the game's rules. Melhado testified that he did not refer to the 1975 source codes in writing his sections of the code. However, he did not know whether Paris, who had written the simulation portions of the 1975 source codes, used the earlier programs in writing the Alpha Micro source codes. (Tr. 15–16; 116–19; 132–33). Like the 1975 source codes, the 1984 Project Management source code was written in FORTRAN. The 1983 Operations Management program was written in Pascal, and was derived from the 1981 Operations Management

---

9. Melhado testified:

Q. How did you come to create the 1983 programs which run those games?
A. We decided that time sharing was awkward and Alpha Micro has begun producing a machine that was small enough to carry around to training sessions and it became apparent to me that this was a better way of doing things than time sharing. So we decided to create these programs and put them on the Alpha Micro computer.
Q. Can you describe what contact or what relationship you had with defendants with

respect to the creation of the 1983 programs? Start with the operations one.
(Tr. 12–13). At this point, the Court interrupted to ask a clarifying question regarding the differences in technology which led to the creation of the 1983 programs. However, counsel never returned to the question of Censor's role in initiating the transition to Alpha Micro hardware.
Censor's deposition testimony on this point is equally unenlightening. (Dep. 356–57).

source code Melhado had written.[10] (Tr. 94–95).

Once the Alpha Micro source codes were created, Censor began using them in his training seminars. As with the 1975 source codes, DSI maintained possession of the Alpha Micro software, and over time made minor changes to fix "bugs" in the programs. When Censor ran a seminar using the programs DSI would provide the Alpha Microcomputers and would "load" the programs into the computers by inserting "floppy disks" containing the source codes into the machine. The disks allowed the games to be run a limited number of times. If the client wished to run additional games, DSI would have to be called to allow it to do so. DSI received compensation for the clients' use of the programs on a per-use basis. (Tr. 41–43).

Melhado testified that DSI had customers for the Alpha Micro software other than Censor, including Chase Manhattan Bank. (Tr. 43). Censor was aware for some time before the dispute broke out with DSI that DSI was billing Chase directly for the use of the software (although it is not clear he would agree that Chase was DSI's "customer"). PCI billed Chase separately for the "training components" of the seminars.[11] (Dep. 395–97). There is no evidence in the record concerning Censor's knowledge of and involvement with other customers that DSI billed directly.

The relationship between DSI and PCI began to deteriorate late in the summer of 1985. Melhado testified that he discovered at that time that Paris had been diverting company funds to himself and that PCI had been paying considerably more for the use of the Alpha Micro software than DSI actually received (the implication being that the additional funds were being paid directly to Paris). Paris was fired, and Melhado contacted Censor and demanded that PCI pay

what he considered the "full price" for use of the software. (Tr. 45–46). According to Censor, this action was simply a unilateral attempt by DSI "to raise its prices to an unreasonable level." (Dep. 257).

On February 3, 1986, Melhado wrote to Censor, "[a]s you well know, DSI is no longer prepared to accept the artificially low price for its proprietary software that PCI has been paying." Melhado asserted that PCI was using its proprietary software under an "oral license terminable at will," and "direct[ed] [PCI and Censor] ... to stop using [by February 14, 1986] all DSI proprietary software, including, without limitation, the Project Management and Operations Management programs which run on Alpha Micro computers." (Def.'s Ex. E). On February 12, 1986, Censor wrote back and asserted that the software belonged to PCI, not DSI.

Shortly thereafter, obviously in anticipation of litigation, DSI filed registration statements with the United States Copyright Office for the "Operations Management Simulation Source Code" (Pl's Ex. 6) and the "Project Management Simulation/Game Source Code" (Pl's Ex. 7). Both filings were accepted, effective February 24, 1986. The instant action was filed March 13, 1986.

## II. *Discussion*

In this Circuit, a party moving for a preliminary injunction must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *E.g., Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

**10.** The record does not reflect in what computer language the 1981 program was written.

**11.** The arrangement apparently changed late in 1985, when PCI began billing Chase for its use of the computer simulations as well. Censor explained that the change in billing procedures

was at Chase's request. (Dep. 398–402). This was also the time period in which the relationship between DSI and PCI began to deteriorate. It is not clear how, if at all, the change in billing practices relates to the changing business relationship of the parties.

## A. *Irreparable Harm*

In cases of alleged copyright infringement, irreparable harm may ordinarily be presumed to follow from invasion of the " 'right to the exclusive use of the copyrighted material.' " *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 (2d Cir.1977) (quoting *American Metropolitan Enterprises of New York v. Warner Brothers' Records, Inc.*, 389 F.2d 903, 905 (2d Cir.1968)). *See also Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 982 n. 2 (S.D.N.Y.1980).

I believe that plaintiff here satisfies the irreparable harm requirement even without the benefit of this presumption. As I stated in my Memorandum Opinion and Order dated March 13, 1986, "[i]f plaintiff owns these copyrighted computer programs, as it alleges, defendant's continued use of them is infringing. I do not see how plaintiff could quantify the damages resulting from a wrongful deprivation of its economic leverage as sole lawful licensor." I adhere to my view that this is sufficient to satisfy the irreparable harm requirement.

Defendants contend that DSI has brought this evil upon itself by seeking to terminate PCI's right to use the disputed software. This argument misses the point. Despite the complications arising from these parties' prior dealings, DSI seeks to enforce essentially the same rights that many copyright claimants pray courts to enforce: the right to use the exclusivity of its copyrights as leverage in negotiations with one who, but for a lawful license, would be barred from using that work. The monetary worth of that leverage in

such negotiations would be difficult, at best, to determine. That is sufficient to satisfy the irreparable harm requirement.

## B. *Likelihood of Success on the Merits*

To prove a copyright infringement claim, a plaintiff must show ownership of a valid copyright and copying by the defendant. *Novelty Textile Mills, supra*, 558 F.2d at 1092 (citing 2 M. Nimmer, *Nimmer on Copyright* § 141 at 611 (1976)).[12]

### 1. *Ownership of a Valid Copyright*

A certificate of registration from the United States Copyright Office is *prima facie* proof that the claimed copyright is valid and that the registrant is its legitimate owner. *Id.* at 1092 n. 1; *Russ Berrie, supra*, 482 F.Supp. at 984–85; 17 U.S.C. § 410(c). The presumption that arises upon presentation of a registration certificate is rebuttable; it " 'orders the burdens of proof.' " *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985) (quoting H.Rep. No. 1476, 94th Cong., 2d Sess. 157, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5773). Presentation of a registration certificate thus relieves plaintiff of proving the many facts necessary to show ownership and validity " 'unless the defendant, by effectively challenging them, shifts the burden of so doing to the plaintiff.' " *Id.*

Here, plaintiff has introduced registration certificates for the operations management and project management source codes, establishing a *prima facie* case of ownership and validity. Defendants attack the *prima facie* case on a number of fronts.[13]

---

**12.** "Copying," Professor Nimmer explains, is used in the broad sense of invasion of one of the exclusive rights secured to copyright owners under the Copyright Act. See *Nimmer*, § 141.1 at 611 n. 3 and § 101.1 at 377 (1976 ed.).

**13.** Defendants argue that the 1975 Agreement bars plaintiff's claim for several reasons. They argue this point separately from their copyright argument, suggesting that they believe the contract arguments can be broken out from the copyright analysis and addressed independently. But plaintiff's claim is for copyright infringement, not breach of contract, as defendants

themselves point out. (Tr. 323–24). Plaintiff's entitlement to relief turns on whether it is likely to be able, at a trial on the merits, to make out the elements of a copyright claim, and if so, whether defendant can show that, for reasons such as unclean hands, its rights should not be enforced in equity. I therefore consider defendants' arguments that the Alpha Micro programs belong to defendants (Def. Mem. at 12–17) as an attack on plaintiff's ownership of the claimed copyrights; and I will consider defendants' arguments that plaintiff breached the 1975 Agreement in creating the Alpha Micro programs

### (a) *Ownership*

■ First, defendants attack plaintiff's ownership of the copyrights. Relying on paragraph 8 of the agreement, under which "DSI expressly disclaim[ed] any interest in ... new [simulation] products ... that may be developed at any time in the future," defendants assert that the Alpha Micro software belongs to Censor. Reading paragraph 8 in context, however, I do not find it so broad. Indeed, the creation of the Alpha Micro programs appears to be a situation not contemplated by the agreement at all. The agreement describes the parties' previous relationship, under which "DSI provides, for some Censor clients, consulting services to create the new software that produces the simulations." (¶ 4). DSI had been and would continue to be "paid in full" for those services, and for any use of DSI's proprietary software involved in running those simulation programs "separate from time-sharing payments." (¶ 6). The agreement transfers ownership of that timesharing software, "for which DSI was/and is fully paid," to Censor. (¶ 6). It contemplates that DSI and Censor would negotiate and reduce to writing DSI's compensation for consulting services or provision of proprietary software "before each and every client engagement in the future." (¶ 10).

These procedures, but for the writing, appear to have essentially been followed when the timesharing programs were used—for example, for the Mobil engagement. But the development of software for an entirely new technology, the microcomputers, for no particular Censor client

is a situation which, from the agreement itself and the testimony, does not appear to have occurred prior to the drafting of the 1975 agreement, and the agreement does not appear to anticipate it. It seems improbable that the parties intentionally omitted any arrangement for DSI's fees for such services, yet specified that DSI's fees would be negotiated for its services and use of its software in connection with particular client engagements. The more plausible inference is that this development was simply unanticipated. That being so, I believe the only sensible conclusion is that despite its broad language, paragraph 8 does not apply to new software created in such circumstances. To hold otherwise would mean that the ownership of any new simulation product created by DSI would automatically spring to Censor *gratis*, forever. Absent clear evidence to the contrary, I cannot interpret the 1975 agreement to produce such a startling result.[14]

The parties' conduct with respect to the Alpha Micro programs reinforces this conclusion. When Censor clients used the Alpha Micro software in Censor training courses, DSI was paid for the use of that software. In fact, it appears that DSI received all, and Censor none, of the license fee the client paid for the use of the Alpha Micro software. For example, the record indicates that one Censor client paid a license fee of some $19,500 for one year's use of the disputed software. The client paid that sum to Censor, who paid it in its entirety to DSI (Dep. 226–27; Ex. 20, 21)—an odd result if Censor owned the programs. For another Censor client, DSI itself billed the client for its use of the

---

(Def. Mem. at 6–12) in the context of plaintiff's authority to prepare "derivative works" from the 1975 games and software (see *infra* at 1340) and in the context of the cleanliness of plaintiff's hands (see *infra* at 1342–44).

**14.** Defendants' argument that the provision for work orders in paragraph 10 only applies to DSI services performed for specific clients, and thus does not apply to the "future products" transferred to Censor in paragraph 8, therefore misses the point. The most sensible interpretation of this inartfully drawn agreement is that the parties anticipated, in light of their past practices, that the simulation products to be developed in

the future to which paragraph 8 refers would be developed for particular clients. The circumstances giving rise to this dispute simply do not appear to have been foreseen.

Defendants also contend that even if the written work order provisions in paragraph 10 do apply to the future products transferred to Censor in paragraph 8, plaintiff waived that requirement. For the same reasons, I find this contention unavailing. The agreement simply does not appear to have been drafted to comprehend the circumstances in which the Alpha Micro programs were created.

disputed software. Paris told Censor approximately in 1983 or 1984 that DSI "bills for those things and therefore [he] shouldn't concern [him]self with them." Apparently Censor made no objection to this arrangement. This treatment contrasts with the arrangements made with Mobil for use of the timesharing programs which DSI concedes belong to Censor. Mobil paid license fees to Censor for the training programs, including the computer simulations, and agreed to pay separate "royalties" for the use of DSI's proprietary software incorporated in the 1975 programs. (Ex. 18, ¶¶ 2, 6, 8, 10, 16; Dep. 351; 395–97). The parties themselves, then, treated the Alpha Micro programs as DSI's.

Defendants explain the payments to DSI as fees "for services such as storage, maintenance and delivery of the programs and consulting in connection with the programs." (Def.'s Mem. at 16 n. *). This interpretation, however, assumes that any new software DSI created belonged to Censor upon its creation, before DSI is paid any sum whatsoever for its efforts. Melhado concedes that the numerous changes and improvements he made to the timesharing programs automatically became Censor's property even if they were initiated solely by DSI. (See Tr. 80–81).

I agree that Melhado's concession lends some support to defendants' position. But Melhado also stated that these changes belonged to Censor "because they were for the most part minor modifications to his programs." (Tr. 80–81). Defendants contend "[t]here is no logical reason to treat the [Alpha Micro] software any differently than the earlier modifications and enhancements that became defendants' property without written work orders." (Def. Mem. at 14–15). In fact, they contend, the Alpha Micro programs belong to Censor even more clearly than the earlier changes because, as plaintiff's counsel acknowledged, Censor "participated in the conversions" to the Alpha micro technology. In my view, however, the extent of DSI's efforts in creating the Alpha Micro programs—it appears to have taken several months—qualitatively distinguishes them from the minor changes made to the time sharing programs which all concede are Censor's. At least, it is more logical so to conclude than to find that DSI intended to expend considerable effort in creating micro computer software for Censor for free. Censor's "participation" in the conversion appears to have amounted to knowledge and approval, and perhaps encouragement, of the project. There is no evidence he was more actively involved. Such "participation," absent some evidence of an agreement as to how DSI was to be compensated for its efforts, speaks little to the question of ownership.[15]

Finally, even if the agreement is stretched to comprehend situations involving the creation of software for no particular client, for new technology, the creation of the Alpha Micro programs falls outside that agreement. The agreement clearly contemplates that some fee arrangement would be made to compensate DSI for its efforts. Paragraph 6 of the agreement provides that DSI would continue to be paid for "consulting services" rendered in creating new simulation software. Defendants interpret the payments made to DSI in connection with the Alpha Micro programs as being entirely for services provided *after* the software was created—meaning DSI's initial efforts in creating the Alpha Micro software were *gratis*. In light of the agreement's clear reference to payments for DSI's efforts in creating new software, this result is implausible. Since no fee was paid to DSI for creating the Alpha Micro software, the agreement's provision for transfer of ownership cannot be considered effective as to this software.

For all of these reasons, I reject defendants' challenge to plaintiff's ownership of the disputed software.

---

**15.** Defendants' reliance on plaintiff's counsel's statement that Censor participated in the conversion of the software is strange in light of their insistence that DSI's behavior in creating those programs was wrongful and accomplished behind Censor's back.

(b) *Validity*

Defendants next attack the validity of plaintiff's copyrights. I consider first their contention that the Alpha Micro programs constitute unauthorized derivative works.

The Copyright Act defines "derivative work" as:

a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101.

The author of a derivative work is entitled to copyright protection for the material that author contributes. *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 33–34 (2d Cir.1982); 17 U.S.C. § 103. To qualify for protection, the derivative work must contain " 'some substantial, not trivial, originality.' " *Eden Toys*, 697 F.2d at 34 (quoting *L. Batlin & Sons, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.) (en banc), *cert. denied*, 429 U.S. 857 (1976)). However, copyright protection does not extend to any part of the derivative work in which pre-existing material was used unlawfully—for example, if the copyrighted portions of the pre-existing work were used

without the owner's permission. *Id.* at 34 n. 6; 17 U.S.C. § 103(a). And, if the pre-existing material used without permission "tends to pervade the entire derivative work," copyright protection is denied to the derivative work entirely. 1 Nimmer, *Nimmer on Copyright*, § 306, at 3–22.2 (1985); *see Eden Toys, supra,* 697 F.2d at 34 n. 6.

Plaintiffs concede, for the purposes of this motion, that the Alpha Micro programs are derivative works based on pre-existing works it sold to Censor. Defendants do not seriously argue that the programs are not sufficiently original to qualify as derivative works, and I find plaintiff's contribution to them at least "substantial." [16] However, defendants contend that plaintiff's use of Censor's pre-existing materials was unauthorized.

This contention is meritless. It is not clear when Censor became aware that DSI was creating the Alpha Micro programs, but it is clear that he welcomed them. If he learned of their creation during the course of the project or before it began, his authorization was implicit in his acceptance of the plan. If he learned of their creation only when they were completely finished, which appears inconsistent with his deposition testimony (Dep. 356), he clearly ratified DSI's conduct by his own acceptance and profitable use of the products. *See Eden Toys, supra,* 697 F.2d at 34 n. 6. His belated cry of "foul" can only be described as an afterthought.[17]

---

**16.** In his proffer, defendants' counsel stated that their expert would testify that the Alpha Micro programs "are substantially derived from and in significant part substantially similar to the 1975 code, including with respect to the overall structure and flow of the programs." (Tr. 407–08). Unless DSI's use of Censor's games and programs was unauthorized, this proffer does not undermine DSI's entitlement to claim protection for the source codes as derivative works. "Substantial similarity" is not the test for copyrightability of a derivative work. "By its very nature a 'derivative' work, which is copyrightable as such, borrows substantially from existing works, and is so defined. 17 U.S.C. § 101 (Supp. IV 1980). Yet it is entitled to registration as a copyrighted work even though it would infringe the original copyrighted work if it were created without the permission of the owner of

copyright in the underlying work." *Eden Toys, supra,* 697 F.2d at 34. Although defendants argue at length that the Alpha Micro programs are derived from and substantially similar to Censor's 1975 programs and games, they do not argue that they are not sufficiently original to qualify for copyright protection as derivative works. Since I find that Censor authorized or ratified DSI's use of his games and programs in creating the Alpha Micro software, *see infra*, that software is entitled to copyright protection.

**17.** For the same reasons, I reject defendants' contentions that DSI "violated the express terms of the 1975 contract" and implied covenant of good faith and fair dealing by using Censor's games and programs. (Def. Mem. 6–12).

Defendants next claim that plaintiff's copyright is invalid because it has failed to deposit a copy of its work with the Copyright Office, pursuant to 17 U.S.C. § 408(b).

When DSI filed its copyright registration statements for the Alpha Micro software, it gave the date of creation and publication date as 1983 for the Operations Management program (Pl. Ex. 6) and 1984 for the Project Management program. (Pl. Ex. 7). The filings were accompanied by copies of the first and last 25 pages of the programs, pursuant to 37 C.F.R. § 202.-20(c)(vii)(A). However, DSI did not deposit versions of the programs that existed in 1983 and 1984, but somewhat revised versions that existed at the time of filing in February, 1986. Melhado testified that the 1983 and 1984 versions no longer existed and could not be reproduced. Melhado could not specify how the programs changed in the intervening period, and did not know whether any of the changes were in the first and last 25 pages of the programs. (Tr. 98–99). Since DSI claims copyrights upon 1983 and 1984 programs not deposited with the Copyright Office, defendants maintain, their copyrights are invalid.

This claim is without support in the present Copyright Act. Deposit is part of the registration procedures under the 1976 Copyright Act, and the Act expressly provides, with certain exceptions not claimed by defendants here, that "registration is not a condition of copyright protection." 17 U.S.C. § 408(a). *Compare Wheaton v. Peters*, 33 U.S. (8 Peters) 591, 664–65, 8 L.Ed. 1055 (1834) (holding deposit a prerequisite to protection under earlier copyright law).

Defendants might have urged that plaintiff had no right to sue for infringement, for compliance with the Act's registration requirements is a prerequisite to a right to sue for infringement. 17 U.S.C.

§ 411(a). This argument would be closer to but still wide of the mark. Although defendants characterize plaintiff's behavior as a complete failure to deposit the source codes for which they claim protection, it can just as easily be characterized as an error in the dates listed on the registration form. Errors on the registration application do not affect plaintiff's right to sue for infringement unless they are knowing and might have caused the Copyright Office to reject the application. *Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir.1984) (quoting *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 988 (S.D.N.Y.1980). Innocent errors do not abrogate the presumption of validity afforded registered works by section 410(c) of the Act. *Id.*

There is no reason to believe that DSI knowingly attempted to deceive the Copyright Office as to the date of creation of the programs. Nor is there any reason to believe that the Copyright Office might have rejected the registrations had they given 1986 as the date of creation and publication. The error has no effect, therefore, on plaintiff's right to sue on the presumption of validity arising from the certificate of registration.[18] *Compare Russ Berrie, supra*, 482 F.Supp. at 987–88 (copyright claimant intentionally failed to disclose that copyrighted work was not wholly original).

Defendants' reliance on *Unistrut Corp. v. Power*, 280 F.2d 18, 23 (1st Cir.1960) is misplaced for similar reasons. In *Unistrut*, the plaintiff claimed infringement of a catalog. The catalog "was originally copyrighted in 1942 by proper filing in the Copyright Office." However, at trial the plaintiff only introduced the 1943 edition of the catalog. The later edition contained certain unspecified additions. The Court found the later editions had "clearly [been] pirated," but also found "there was no proof that copies of this later edition were

---

**18.** Plaintiff concedes there were other errors on the registration form. However, the defendants have only argued the date discrepancy discussed in the text in their attack on the validity of the copyrights. Further, there is no evidence that the other errors discussed in plaintiff's brief or at the hearing were intended to deceive the Copyright Office.

deposited with the Copyright Office, and there was no proof that the infringed material was contained in the 1942 edition." *Id.* The Court held that the cause of action failed for want of proof.

Here, in contrast, the plaintiff has deposited with the Copyright Office the versions of the programs which defendants were "caught" using in 1986 and which it asserts were infringed.[19] The erroneous date entered on the registration form does not affect DSI's right to sue. The failure in *Unistrut* to show infringement of a registered, deposited work does not arise here.[20]

For the foregoing reasons, I find plaintiff likely to succeed on its claim that it owns a valid copyright in the Alpha Micro programs.

### 2. *Enforcement of the Copyrights*

Defendants argue that even if plaintiff owns valid copyrights in the Alpha Micro software, the copyrights should not be enforced. They invoke the equitable doctrine of unclean hands.

The unclean hands defense has occasionally been held to bar of a valid copyright. However, plaintiff's wrongdoing must be "of serious proportions." 3 M. Nimmer, *Copyright,* § 13.09[B] at 13–145 [citations omitted]. Moreover, it "is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979), *cert. denied sub nom. Bora v. Mitchell Brothers Film Group,* 445 U.S. 917, 100 S.Ct. 1277,

63 L.Ed.2d 601 (1980) (quoting *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933). The conduct "must be such that the prosecution of [the plaintiff's] rights will of itself involve the protection of the wrongdoing." *Leo Feist, Inc. v. Young,* 138 F.2d 972, 976 (7th Cir.1943). Thus, the defense has been recognized

> where the plaintiff misused the process of the courts by falsifying a court order, or by falsifying evidence, or where the copyright was procured by making fraudulent representations about authorship to the Register of Copyrights, or where plaintiff misrepresented to the court and to the opposing party the scope of his copyright, or where he obtained information as to the nature of defendant's work through unfair means.

3 Nimmer, *supra,* at 13–145–13–147 (citations omitted). *See Testa v. Janssen,* 492 F.Supp. 198, 201 (W.D.Pa.1980).

Defendants contend that plaintiff's copyrights should not be enforced because its copyright registration certificates "were knowingly false and fraudulently filed." This contention is without support in the record.

Only a "'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] a reason for holding the registration invalid and thus incapable of supporting an infringement action ... or denying enforcement on the ground of unclean hands.'" *Eckes v. Card Prices Update,* 736 F.2d 859, 861–62 (2d Cir.1984) (quoting *Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F.Supp. 980, 988 (S.D.N.Y.1980)).

■ Defendants maintain that plaintiff intentionally misled the Copyright Office

---

**19.** At least that is substantially so. The copyrighted source codes themselves were not actually used by Censor—rather, what the computer actually executed was the object codes the computer derived from the source code. An owner of a copyrighted source code, however, "is protected from unauthorized copying, whether from its object or source code version." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714

F.2d 1240, 1249 (3d Cir.1983), *cert. denied,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

**20.** I also note that *Unistrut* was not decided under the current Copyright Act. However, since *Unistrut* is clearly distinguishable on its facts, I find it unnecessary to consider the effects of the substantial post-*Unistrut* changes in the statute.

by claiming copyright protection on the registration certificate for 1983 and 1984 versions of the programs which could not be reproduced, and depositing with the application 1986 versions of the programs. They note that plaintiff deleted the "comments" from the versions deposited with the Copyright Office, some of which indicated that those versions had been edited, or at least examined, after 1983 and 1984. (Tr. 135–40).

This argument finds evil intent where innocent error is the far more likely explanation. Plaintiff clearly seeks protection against defendants' use of the Alpha Micro programs as they now exist, not as they existed in 1983 and 1984. The most reasonable explanation for the date discrepancy is that plaintiff entered the wrong dates on the registration forms. Melhado credibly testified that he had been advised, presumably by counsel, to enter 1983 and 1984 on the registration forms. (Tr. 67–68). There is no reason to believe DSI entered those dates in order to mislead the Copyright Office. Nor is there any reason to believe that the Copyright Office would have denied the registration application had 1986 been entered on the forms. It is not clear why Melhado caused the computer mechanically to remove the comments from the printout submitted to the Copyright Office. However, it is clear that he removed all the comments, and not only those that indicated the most recent "edit" dates, from the printout. There is no reason to believe he did so to mislead the Copyright Office.

Defendants also contend plaintiff deliberately concealed Censor's ownership of the 1975 programs and the simulation games in its registration application "in the face of specific and clear instructions" to reveal it. (Def. Mem. at 31). Space 6 of the registration application requires the applicant to "[i]dentify any preexisting work or works that this work is based on or incorporates." In this space on both forms, plaintiff wrote,

"Computer generated simulations of same title published in 1975." Pl. Ex. 6, 7).

▮▮▮ This statement sets forth exactly what plaintiff was commanded to set forth by the instructions. I cannot agree with defendants that the "clear inference from plaintiff's responses in Space 6 was that the preexisting works were owned by plaintiff." (Def. Mem. at 31). Plaintiff's entries in Space 6 are simply silent as to ownership of the preexisting works identified. Its response put the Copyright Office on notice that the works to be registered were derivative, permitting it to make further inquiry as to ownership if so advised. *Compare Russ Berrie, supra,* 482 F.Supp. at 988 (plaintiff deliberately concealed fact that work was based on prior works).

For these reasons, I reject defendants' claim that plaintiff knowingly misled the Copyright Office or deprived it of the "opportunity to pass on plaintiff's claim accurately presented." *Id.*

Defendants argue plaintiff has misbehaved in other ways which bar its claim for equitable relief. First, they point to plaintiff's allegedly wrongful use of the 1975 programs and simulation games owned by Censor. I have already rejected this argument,[21] concluding that plaintiff's use of Censor either authorized or ratified plaintiff's use of his programs and games to create the Alpha Micro programs.

Defendants next argue that plaintiff's attempt to "force Mr. Censor to the [bargaining] table" (Tr. 169) is a coercive misuse of its copyrights. This bargaining position, however, is part and parcel of the exclusive rights the Copyright Act confers upon a holder. To invoke that right may be "hard ball," but it can hardly be considered wrongful.[22]

Finally, defendants argue that plaintiff's hands are unclean because prior to 1981 it conducted training seminars in Europe in-

21. See page 1340 *supra.*

22. *Wihtol v. Crow,* 199 F.Supp. 682, 685 (S.D. Iowa 1961), can, in my view, clearly be distinguished from the case at bar; but I need not do

so, since the district court's judgment on the point for which defendants cite the case was reversed on that ground, 309 F.2d 777, 782 (8th Cir.1962).

volving Censor's simulations and using the 1975 software which plaintiff concedes belongs to Censor. It did not pay Censor for the use of those programs and games (Tr. 170–71), and now appears to concede that because the games themselves belong to Censor, DSI cannot run even the Alpha Micro software for anyone other than Censor without violating the 1975 contract. (Tr. 377). Questioned about his company's use of Censor's materials, Melhado answered that the 1975 contract "never occurred to me." (Tr. 171). Plaintiff's contention that Censor was aware of these overseas adventures (Tr. 373–74) is not supported in the pages of Censor's deposition cited by plaintiff. Censor did know that DSI billed one client directly for the use of the Alpha Micro software in the United States, and he testified that he "was not clear, or was certainly not made aware directly for time-sharing charges." (Dep. 395–96). Presumably Censor's comment regarding time-sharing charges applies to DSI's overseas, pre–1981 seminars, since at that time only the time-sharing programs existed.

For several reasons, I do not believe plaintiff's claims should be barred because of these pre–1981 overseas seminars. First, I do not find the seminars sufficiently related to the subject matter of this action. The rights directly at issue in this action are the copyrights in the Alpha Micro programs. Whether or not DSI was entitled to run training seminars overseas prior to 1981 has no impact on this issue. It cannot be said, therefore, that "prosecution of [DSI's] rights" in respect of the Alpha Micro programs "will of itself involve the protection of the wrongdoing." *Leo Feist, supra,* 138 F.2d at 976. Nor can it be said that the pre–1981 seminars "affect the equitable relations between the parties," *Mitchell Brothers Film Group, supra,* 604 F.2d at 863, in respect of rights to use the Alpha Micro programs in 1986. That is especially so because any misconduct in which DSI may have engaged overseas took place at least five years ago.

Furthermore, it is not at all clear that DSI's pre–1981 conduct was sufficiently serious to warrant denial of relief based on unclean hands. Although it cannot be positively asserted that Censor knew about those seminars, his testimony that he was "not clear or was certainly made aware directly for time-sharing charges" hardly settles the question of what Censor knew when. Further, it appears that despite the 1975 contract at least some aspects of the relationship between the parties remained unclear. Although it was quite clear that the games themselves and the 1975 programs belonged to Censor, and although plaintiff now concedes it cannot run the games without Censor's permission, it is not incredible in view of the relationship between these parties that it did not occur to Melhado that the contract forbade him from running those games overseas.

I conclude, therefore that DSI's pre–1981 training seminars should not bar present claims under the unclean hands doctrine. I therefore find the copyrights enforceable.

### 3. *Infringement*

Plaintiff asserts defendants have infringed its copyrights in two ways. First, according to DSI, defendants conducted several seminars using the copyrighted materials after February 14, 1986—the date by which Melhado's February 3, 1986 letter demanded that defendants stop using the Alpha Micro software—and March 13, 1986, the date this Court issued a temporary restraining order barring defendants' further use of the Alpha Micro software. Three such seminars appear to have been conducted during this period. Defendants argue that these seminars did not infringe plaintiff's copyrights—the validity and ownership of which, of course, they do not concede—because under the 1975 contract they were entitled to use them.

Paragraph 13 of the 1975 agreement provides, in pertinent part, that DSI "may elect to stop providing consulting services, or proprietary software at any point in the future providing only that they do not stop providing such services in the course of a client engagement." Defendants argue that this provision prohibits plaintiff from withholding services for a particular client once that client is "booked." Since the

seminars at issue were "booked" several months before DSI mailed its letter of termination (Dep. 411–13), defendants maintain that letter was ineffective as to those seminars. Thus, they contend, defendants' use of the programs during those seminars was authorized and non-infringing.

 Assuming, as the parties do, that paragraph 13 applies to the Alpha Micro software, I nonetheless cannot agree with defendants' interpretation of that paragraph. In my view, the plain meaning of paragraph 13 is that DSI cannot stop providing the software in the midst of a seminar. That interpretation is espoused by Melhado (Tr. 108–11), and Censor did not testify to the contrary. While it may cause defendants considerable inconvenience to learn after booking a client that DSI would not provide expected services and software, the plain language of the 1975 agreement does not appear to protect defendants from that possibility. Especially because Censor drafted the document, I will not strain to read it otherwise.

I conclude, therefore, that defendants' use of the Alpha Micro software during these seminars infringed valid copyrights owned by DSI.

During the hearing, plaintiff presented considerable evidence concerning a second specific claim of infringement. This claim involves certain software not provided by DSI now used by defendants to run at least one of the Alpha Microcomputer simulation games (the "1986 software"). Plaintiff maintains that the 1986 software was unlawfully derived from the copyrighted Alpha Micro programs. Plaintiff failed to brief this issue, however, in its post-hearing memoranda. Indeed, I had considered this claim abandoned, until I received a letter dated August 27, 1986 from plaintiff's counsel which indicated that it believed the issue *sub judice.* I decline to consider this claim, however, without the benefit of memoranda of law addressing this claim. If plaintiff wishes to pursue its claim as to the "1986 software," it is direct-

ed to serve by hand and file memoranda of law addressing any issues raised by that claim within ten (10) days of the date of this Memorandum Opinion and Order. Defendants may serve by hand and file papers in response within ten (10) days of service of such papers, if any.

*Conclusion*

For the foregoing reasons, I find it likely that plaintiff will succeed on the merits of its copyright claim.[23] Plaintiff's motion for a preliminary injunction against further infringement of its copyrights in the 1983 Operations Management Source Code and 1984 Project Management Source Code is therefore granted. Plaintiff may settle an appropriate order on five (5) days' notice.

No order will issue at this time pertaining to the 1986 software now in use by defendants. Plaintiff may pursue such claim in accordance with the above-outlined procedure, failing which I will deem that claim withdrawn.

It is SO ORDERED.

---

**23.** I need not and do not, therefore, reach the second prong of the *Jackson Dairy* test—the

balance of the equities.