In re C TEK SOFTWARE,
INC., Debtor.

C TEK SOFTWARE, INC., Plaintiff,

v.

NEW YORK STATE BUSINESS VEN-
TURE PARTNERSHIP, Jeanne Mauney
a/k/a Jeanne Mauney Chambers, and
Intelligent Investment Systems, Inc.,
Defendants.

Bankruptcy No. 89–303.
Adv. No. 89–161.

United States Bankruptcy Court,
D. New Hampshire.

March 1, 1991.

Mark Vaughn, Devine, Millimet, Pa.,
Manchester, N.H., for New York State
Business Venture Partners.

Kenneth R. Bruce, Buchanan Ingersoll,
P.C., Pittsburgh, Pa., for Intelligent Invest-
ment Systems, Inc.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

Debtor, C Tek Software, Inc., initiated an
adversary proceeding against certain credi-
tors to determine the validity, extent, or
priority of certain liens. In an earlier opin-
ion, I decided that New York State Busi-
ness Venture Partnership ("NYSBVP") had
a perfected security interest in the comput-
er software ClienTrak. See *In re C Tek
Software, Inc.*, 117 B.R. 762 (Bankr.D.N.H.
1990). However, I left for a further trial
the question of "the extent of the security
interest NYSBVP has in the source code in
light of the enhancements made after the
security interest was taken." *Id.* at 763 n.
1. A trial was held on this matter on
October 10, 1990, and I then took the mat-
ter under submission.

### Findings of Fact

1. C Tek is the owner of a computer
software known as "ClienTrak." This soft-
ware is sold to companies in the financial
services industry, principally banks and in-
surance companies. The software stores
information and generates correspondence.

2. On October 26, 1987, NYSBVP took and perfected a security interest in some pieces of hardware owned by C Tek as well as "[t]he source code and all ownership rights to the computer software ClienTrak including copyrights 1983, 1984, 1985, 1986 and 1987."[1]

3. On June 17, 1988, C Tek entered into a Master Distribution Agreement ("MDA") with Intelligent Investment Systems ("IIS"). The MDA is a ten year licensing agreement which gives IIS the exclusive worldwide right to sell and develop the software ClienTrak. Under the MDA, IIS promised to pay C Tek royalties, which would decrease in amount over time as IIS made changes to the software. Most importantly, paragraph 2.1(f) of the MDA gave IIS the right "to produce, copy, distribute and market derivative versions of the software and documentation without limitation."

4. At the time the MDA was executed, the software ClienTrak was at version 3.7.-2B. It would have taken a group of programmers about five years to independently produce comparable software.

5. On April 6, 1989, C Tek filed a chapter 11 petition in this court. On August 31, 1989, NYSBVP got a default order vacating the automatic stay but without prejudice to C Tek's rights to initiate this adversary proceeding.

6. IIS made revisions to thousands of lines of source code after receiving its licensing rights under the MDA. IIS employed several programmers to make the changes and assist users. The software is currently at version 4.1.8. The differences between this source code and the prior version delivered to IIS at the time the MDA was executed are of three types.

First, the overwhelming majority of changes were the elimination of "bugs" *i.e.*, minor defects in the source code so the software does not operate as intended. Second, some minor "cosmetic" changes were made to make the display and controls more user friendly. Third, three major changes were made to the import function, the report customizer, and the communications message exchange. This last group of changes are the only ones a programmer would call "enhancements." No new "modules" were added to the five modules existing in version 3.7.2B.

### The Issue

IIS is not now contending that it has rights to market the software through version 3.7.2B after foreclosure. The dispute concerns who owns the changes made to the software after that point up to version 4.1.8. IIS recognizes that copyrights of a derivative work cover only the original matters added and not the underlying work. *Nimmer on Copyrights*, § 3.04 (1990).

There is little room to question IIS' right to attempt to copyright any derivative software it may develop under paragraph 2.1(f) of the MDA. NYSBVP argues that the MDA did not expressly say IIS had copyright rights in its derivative product only that IIS could produce derivative works.[2] Yet, any other construction of this contractual provision would be contrary to the logical inference of this provision and the spirit and intent of the MDA. Also, it seems plain that if there was no agreement as to who owns copyrightable material it should be the author of such material.

---

1. NYSBVP has argued that the language of this provision gives it the right to future modifications of the software made by Intelligent Investment Systems ("IIS"). However the security interest did not attach to modifications made by IIS under NY UCC § 9–203(1)(c) because this opinion concludes that the debtor did not have any interest in that collateral.

2. NYSBVP cites the case of *Gracen v. The Bradford Exchange*, 698 F.2d 300 (7th Cir.1982) for the proposition that the right to copyright derivative works must be expressly granted. However, the facts of that case are quite different. Indeed, the court there said the reason why you need the owner of the pre-existing work to grant an express right to copyright derivative works is that "that might [otherwise] impede him in making his own derivative works or in licensing others to do so." *Id.* at 303–04. Here, the evidence is clear C Tek had no interest in making its own derivative software and would look to no other party during the ten year life of its agreement with IIS to make derivative software.

NYSBVP also argues that paragraph 4.2(b) of the MDA[3] provides that upon termination of the agreement C Tek will step into the shoes of IIS. However, this provision has nothing to do with copyrights in derivative works. Rather, it concerns sublicenses and subdistributorship agreements of the original software.

The only substantive question before me is whether some or all of the changes IIS made to the source code were significant enough to meet the "originality" requirement for copyright protection[4] for a "derivative work".

### Copyright Law

■ A derivative work is defined by statute as follows:

A work based upon one or more preexisting works, [in] any … form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which as a whole represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

I start with the proposition established by the U.S. Supreme Court in *Stewart v. Abend,* —— U.S. ——, 110 S.Ct. 1750, 1761, 109 L.Ed.2d 184 (1990) ,that:

[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work.

In order to qualify as a derivative work, and thus qualify for copyright protection, the work must be "original." This term is not defined by the copyright statute, but there is some modest guidance in the First Circuit. In this district, the district court put some flesh on this concept in *Knickerbocker Toy Co., Inc. v. Winterbrook Corp.,* 554 F.Supp. 1309 (D.N.H.1982). There the court stated:

"The test of originality is concededly one with a low threshold." *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486 (2d Cir.) (en banc), *cert denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976).

All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own. *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S.Ct. 298 [300], 47 L.Ed. 460 [1902].

*Alfred Bell* [*& Co. v. Catalda Fine Arts* ], *supra* [191 F.2d 99] at 102–03 [2d Cir.1951] (footnotes omitted).

\*    \*    \*    \*    \*    \*

Works substantially derived from prior works, whether the preexisting works are copyrighted or in the public domain, are also subject to copyright protection so long as the derivative work itself is original. 17 U.S.C. §§ 101, 103(b). The original aspects of the derivative work must themselves be nontrivial, and the copyright in the derivative work does not affect the copyright protection in the underlying work. *Durham* [*Indus. Inc. v.*

---

**3.** This section reads:

*License Rights after Termination.* Upon termination of this Agreement for any reason other than breach by Licensor, Licensor, at its election, shall succeed to any rights of Distributor under the terms of any sublicenses or sub-distributorship agreements which have been entered into by Distributor with regard to the Software except with respect to such receivables that accrue to the benefit of Distributor prior to such termination.

**4.** There is now no question that computer software and source code that meets the originality requirement is entitled to copyright protection. See *Applied Innovations, Inc. v. Regents of the University of Minnesota,* 876 F.2d 626, 635 (8th Cir.1989); *Whelan Assoc. Inc. v. Jaslow,* 797 F.2d 1222, 1233 (3d Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1246–47 (3d Cir.1983), cert. dismissed, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 855 n. 3 (2d Cir.1982); *Lotus Dev. Corp. v. Paperback Software Inter'l,* 740 F.Supp. 37, 45 (D.Mass.1990).

504

*Tomy Corp.*], *supra* [630 F.2d 905] at 909 [2d Cir.1980].

*Id.* at 1317–18.

Unfortunately, that case involved a comparison of dolls which does not provide much guidance to this court. However, the language used did say originality is an easy concept to meet, and the court would not allow summary judgment against the derivative author even where it found the "[n]ontrivial differences between the ... dolls are indeed difficult, if not impossible, to discern." *Id.* at 1318.

A case in this Circuit involving "knowledge", which is at issue in my case, is *Rubin v. Boston Magazine Co.*, 645 F.2d 80 (1st Cir.1981). In this case, the Court held that particular questions about love and romance were copyrightable as original forms of expressions. One relevant comment in the opinion, which deals with the idea-expression dichotomy of copyright law and not the originality concept, is the following:

> Nor are the scales [questions] uncopyrightable because to give copyright protection to the scales will give Dr. Rubin a monopoly of the theory on which the scales are based. There are an infinite number of ways of stating Dr. Rubin's theory and an infinite number of questions which may be asked to find out whether two persons have the characteristics to which the theory refers.

*Id.* at 83.

This is directly analogous to my case because both experts agree two programmers can program for the same result in different ways. In fact, typically programmers disagree how to write source code in solving the same problem.

Getting back to the originality concept, the only other case of some help in the First Circuit is *Lotus Dev. Corp. v. Paperback Software Inter'l*, 740 F.Supp. 37 (D.Mass.1990). This was a computer case, but did not discuss the precise issue before me involving numerous minor changes to source code that arguably meet the originality requirement. However, the case did briefly discuss the concept of originality and emphasized that the *significance* of the purported derivative work is not the test for originality. The Court stated:

> It is axiomatic that the designation "original" is not intended to be limited to works that are novel or unique. Rather, the word "original," which was "purposely left undefined" by Congress refers to works that have been "independently created by an author," regardless of their literary or aesthetic merit, or ingenuity, or qualitative value.

I find this point meaningful because NYSBVP has in part belittled the "bug" work as not being important enough to warrant protection. The law simply does not support this contention.[5]

To answer completely the question of what is the test for originality in "knowledge" cases[6], I must look to a series of four Eighth Circuit cases. Before examining those cases, however, I will first discuss the one computer case that almost addresses the issue before me.

In *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816 (M.D. Tenn.1985), the court found that computer software version "SAS 79.5 represents overwhelmingly a new and original work of authorship, above and beyond the pre-existing work contained in" version SAS 76.2. *Id.* at 827. However, the revisions involved five years of work and only significant changes were made to the source code. Thus, the issue I am faced with regarding more modest changes to source code was not squarely presented in that case.

The Eighth Circuit has issued a series of "knowledge" copyright cases that provide considerable guidance as to what constitutes originality in a "knowledge" case.

**5.** As noted long ago by Justice Holmes in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1902): "The least pretentious picture has more originality in it than directories and the like, which may be copyrighted."

**6.** I am using the term "knowledge" case to distinguish these cases from the more traditional copyright case involving artistic forms of expression. However, I believe both types of cases employ the same legal standard.

The first case is *Hutchinson Tel. Co. v. Fronteer Directory Co. of Minnesota, Inc.*, 770 F.2d 128 (8th Cir.1985). In this case, the Court held that the creation of a white pages telephone directory was an original work of authorship. The Court explained:

> "Originality" under the prior construction did not connote novelty or uniqueness but simply that the work be independently created. If a work is similar to preexisting works, it must show more than trivial variation from those works.

> * * * * * *

> Hutchinson's records are gathered and maintained for many purposes, including publication of a directory. The proper focus is not whether Hutchinson's sole motivation for maintaining the records is the publication of a directory, but whether the directory itself is derived from information compiled and generated by Hutchinson's efforts.

*Id.* at 131–32.

■ Thus, the court was focusing on the *independent effort*[7] of the author in deeming the work original. This focus on independent effort[8] was carried over into the second case of the series—*The Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir.1986). The Court there held that a lawn care manufacturer's parts numbering system lacked even a low threshold of originality and commented:

> Under originality case law a work need not be artistic or novel to achieve protection. *Mazer v. Stein*, 347 U.S. 201 [74 S.Ct. 460, 98 L.Ed. 630] (1954). Originality denotes only enough definite expression so that one may distinguish authorship.

> * * * * * *

> If the disputed work is similar to a pre-existing protected work or one in the public domain, the second work must contain some variation recognizable as that of the second author.

> * * * * * *

The undisputed evidence below shows that appellant's "system" is composed of arbitrarily assigning to a particular replacement part a random number when appellant creates the part. Appellant's Vice President for Distribution testified that once a part is created "an arbitrary number is assigned" to the part to identify it. Appellant's counsel, when moving for a new trial, told the court that "it was undisputed at trial that Toro's parts numbering system was arbitrary and random." There was no evidence that a particular series or configuration of numbers denoted a certain type or category of parts or that the numbers used encoded any kind of information at all. In short, numbers were assigned to a part without rhyme or reason. This record establishes that appellant's parts numbering "system" falls short of even the low threshold of originality. The random and arbitrary use of numbers in the public domain does not evince enough originality to distinguish authorship. The expression itself is nothing more than the public domain numbers. There is no variation, other than the trivial hyphen, to establish authorship. Also, it is clear that no *effort or judgment* went into this selection or composition of the numbers, which distinguishes this case from the telephone directory cases. We are left, then, with the accidental marriage of a part and a number. We do not believe that such a marriage produces an original work of authorship. Appellant simply has not added enough to its parts numbers to make them original and remove them from the public domain. This is not to say that all parts numbering systems are not copyrightable. A sys-

**7.** Another Circuit agreeing with this concept of independent effort is the Second Circuit. See *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.1980) ("Although novelty, uniqueness and ingenuity is not required, independent creation is. Independent creation, in turn, means that a work must not consist of actual copying. This test of originality, which has been aptly characterized as "modest," "minimal," and as establishing a "low threshold," is the sine que non of copyrightability.")

**8.** Effort alone is not enough to obtain copyright protection. See *Hearn v. Meyer*, 664 F.Supp. 832 (S.D.N.Y.1987).

tem that uses symbols in some sort of meaningful pattern, something by which one could distinguish effort or content, would be an original work. Originality is a very low threshold, but still a threshold.

*Id.* at 1212–13 (emphasis added).

The next Eighth Circuit case on this issue is *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1223 (8th Cir.1986). In this case, the court held that the arrangement of page numbers by a legal publishing company was original. (The Court distinguished *Toro* on the grounds that the arrangement took some effort.) Thus, a competing computer legal research service could not appropriate the page numbering. This decision is obviously on the fringe end of originality requirements. Regardless, its definition of originality is highly instructive. The court stated:

> The standard for "originality" is minimal. It is not necessary that the work be novel or unique, but only that the work have its origin with the author—that it be independently created. *Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128, 131 (8th Cir.1985). Little more is involved in this requirement than "a prohibition of actual copying." *Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 102–103 (2d Cir.1951); see also M. Nimmer, 1 Nimmer on Copyright s. 2.01 (1985).
>
> To be the original work of an author, a work must be the product of some "creative intellectual or aesthetic labor." *Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1973). However, "a very slight degree of such labor[,] ... almost any ingenuity in selection, combination or expression, no matter how crude, humble or obvious, will be sufficient" to make the work copyrightable. M. Nimmer, 1 Nimmer on Copyright, supra, s 1.08[C].

Thus, the Court was once again looking at *independent effort or judgment* to deem something an original creation. This was carried over in the last of the Eighth Circuit cases—*Applied Innovations, Inc. v. Regents of the University of Minnesota,* 876 F.2d 626 (8th Cir.1989). In this case, the court held that psychological test statements that were "independently created" are original and copyrightable. *Id.* at 635. It also held that *revisions* to the questions "are recognizable as the work of the authors and thus are sufficiently original." *Id.* at 636.

Applying these Eighth Circuit cases to my case I believe all of the efforts of IIS in revising the source code, *when considered collectively,* are original work entitled to copyright protection. The changes the IIS programmers made to the source code required independent effort and judgment. Even NYSBVP's own expert admitted that it is more difficult to modify another programmer's source code than to create one's own. IIS has created something that is recognizably its own in the source code. Admittedly, most of the changes are not important modifications to the functionality of the source code, but that is not the test under copyright law. IIS' changes are not "trivial" in the copyright sense; they required more than token independent effort or judgment.

NYSBVP argues in its final brief that the "changes were mostly in the nature of corrections, which do not constitute original authorship, and that any changes that arguably added new features only revised functions the software was already capable of performing. Derivative copyright protection requires more." *Supplemental and Final Memorandum of Law* by NYSBVP, at p. 7. I disagree under the facts of this case. NYSBVP cites *Dynamic Solutions, Inc. v. Planning & Control, Inc.,* 646 F.Supp. 1329 (S.D.N.Y.1986), but this case is inapposite. That case involved a software developer who created one software, which he sold, along with future "minor modifications", *id.* at 1339, to a business training program provider. When the developer developed a second software that the trainer used without compensating the developer fully the court held the second software was not within the scope of the prior sale. The court ruled the second software was "unanticipated" by the contract, *id.* at 1338, and then went on to hold

that the second program was "sufficiently original to qualify as derivative works." *Id.* at 1340. The only possible relevance of this case to mine is when explaining why the second program was beyond the scope of the contract the Court found a qualitative difference between the contractual minor changes and the second program because the latter "appears to have taken several months" of "effort" of one programmer. *Id.* at 1339. Assuming this can in some way relate to the later finding of originality of the second program, this supports my conclusion because the Court did not focus on functionality, but effort. In addition, I believe IIS' efforts have involved a similar time period.

Finally, I find support in my decision if I look to the purpose of copyright law and the originality requirement. The purpose of copyright law is to encourage creative activity by granting a *limited* monopoly.[9] What IIS did is socially useful work. NYSBVP's own expert said most of the work—the debugging work—was "warranty work." This is valuable work and should be encouraged.

Nor will the purpose of the originality requirement be thwarted. In a seminal opinion on originality, *L. Batlin & Sons, Inc. v. Snyder*, 536 F.2d 486 (2d Cir.1976), the court explained that the originality requirement is designed to prevent someone from making "minuscule variations", *id.* at 492, to monopolize preexisting work.[10] One commentator has explained why courts should be particularly careful in assessing the originality requirement for derivative works:

> The requirement of originality is significant chiefly in connection with derivative works, where, if interpreted too liberally, it would paradoxically inhibit rather than promote the creation of such works by giving the first creator a considerable power to interfere with the cre-

ation of subsequent derivative works from the same underlying work.

18 Am.Jur.2d Copyright and Literary Property § 19 (1985).

IIS is not trying to monopolize preexisting work. It merely seeks copyright protection for its own derivative work, which is severable from the preexisting work.

### *Accession*

■ Having determined that IIS has a copyright in changes from source code version 3.7.2B to 4.1.8, I am left with the question of how NYSBVP can foreclose on the source code. The testimony clearly established that IIS could return version 3.7.2B to the creditor. Therefore, under the law of accession this is all NYSBVP could get. A case illustrating this principle is *AMCA Int'l Finance Corp. v. Interstate Detroit Diesel Allison, Inc.*, 428 N.W.2d 128 (Minn.Ct.App.1988). In this case the debtor replaced the engine of an excavator subject to a security interest, and was allowed to give the creditor the original engine when the creditor repossessed. The court explained:

> The only way, therefore, that [creditor] would have a security interest would be through the doctrine of accession. Accession is defined as follows:
>
> We think the general rule is quite well settled that, where the articles later attached to an automobile or other principal article of personal property became so closely incorporated with the principal article that they cannot be identified and detached therefrom without injury to the automobile or principal article, such articles become part of the machine or principal article to which they are so attached and will pass by accession to one having a chattel mortgage or other lien upon the principal article, if the lien is enforced. *But when the articles added can be*

---

**9.** Much of copyright law is counterintuitive unless you keep in mind the concept of a limited monopoly granted to the first creator of a copyrightable work. The monopoly granted to the original creator is essential to *encourage* creative activity, but it must be limited to avoid

*discouraging* creative activity by subsequent parties.

**10.** An important case discussing the originality requirement in the context of preexisting work is *Durham Indus. Inc. v. Tomy Corp.*, 630 F.2d 905, 910–11 (2d Cir.1980).

*readily identified and detached without injury to the principal machine or article, they do not pass by accession to the one having a prior chattel mortgage or lien on the principal article.*

*Goodrich Silvertown Stores of B.F. Goodrich Co. v. Pratt Motor Co.*, 198 Minn. 259, 261–62, 269 N.W. 464, 465 (1936).

428 N.W.2d at 129–130 (emphasis added). See also *IDS Leasing Corp. v. Leasing Assoc. Inc.*, 590 S.W.2d 607 (Tex.Ct.App. 1979).

### Conclusion

IIS had a license from the debtor to copyright derivative software. The software IIS developed is copyrightable because it meets the originality requirements of copyright law. Thus, since the changes to the source code can be severed from the underlying work, IIS owns those changes free and clear of any lien of NYSBVP.